**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THE DISCOVERY HOUSE,** | |
| **Plaintiff,** | Civ. No. 19-21602 (KM) (JBC) |
| **v.** | **OPINION** |
| **ADVANCED DATA SYSTEMS RCM, INC.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

This case arises from a contract between plaintiff The Discovery House ("TDH") and defendant Advanced Data Systems RCM, Inc. ("ADSRCM"). TDH provides rehabilitation for substance and alcohol abuse patients. It hired ADSRCM to prepare, process, and file certain reimbursement claims TDH submits to commercial and government payers for services provided to its patients. TDH now alleges that ADSRCM committed a series of errors while carrying out its processing obligations, errors which caused over $4 million in alleged damages, nearly bankrupting TDH.

The contract between the parties, however, contains a clause which grants an arbitrator exclusive jurisdiction over claims arising out of or in connection with their contract. I find that the provision applies here and requires that TDH's claims be arbitrated. As discussed below, I am not convinced by TDH's various arguments which aim to invalidate or avoid the arbitration clause.

For the reasons expressed herein, ADSRCM's motion to compel arbitration and stay this action (DE 6-1) is granted.

## I.   BACKGROUND

### A. The Purchase and Service Agreements[1]

TDH is a California LLC which provides rehabilitation for substance and alcohol abuse patients. (Compl. ¶ 2.) ADSRCM is a New Jersey LLC which provides healthcare software solutions. (*Id.* ¶ 3.) On July 13, 2018, the parties entered a contract comprising two interlinked agreements. (*Id.* ¶ 6.)[2]

The first agreement was a two-page document which set out ADSRCM's pricing terms (the "Purchase Agreement"). (Compl. Exh. A.) The Purchase Agreement explains that ADSRCM anticipated $14 million in TDH collectables, on which it would apply a minimum service fee of $40,000 or 6% of collectables, whichever was higher. (*Id.*) It also set forth certain monthly subscription fees and a one-time setup fee of $500. (*Id.*) The second page very briefly described certain steps TDH would need to take in order to work with ADSRCM, such as that it would have to scan insurance cards and "[p]romptly repl[y] to assigned asks." (*Id.*)

In the middle of the first page of the Purchase Agreement, immediately beneath the "Total Due At Contract" line which set forth how much TDH was required to pay at signing, and in slightly smaller font than the rest of the agreement,[3] is a sentence which reads as follows: "By signing this proposal

---

[1] For ease of reference, certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| Compl. | = | TDH's Complaint (DE 1) |
| MTA | = | ADSRCM's Motion to Compel Arbitration and Stay Proceedings Pending Arbitration (DE 6-1) |
| Opp. | = | TDH's Opposition (DE 13) |
| Reply | = | ADSRCM's Reply (DE 15) |

[2] On this motion to dismiss, I presume TDH's allegations are true except to the extent they are merely legal conclusions. *N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.,* 760 F.3d 297, 302 (3d Cir. 2014).

[3] The font appears to be one size smaller than the bulk of the other writing in the agreement. It is the same size, and in the same location, as the provision that sets the minimum service fee. (*Id.*)

Client accepts the Advanced Data Systems RCM MedicsRCM Service Agreement located at: http://pubftp.adsrcm.com/medicsRCM.serviceagreementv12pdf."
(*Id.*)

That link led to the second agreement (the "Service Agreement"). The Service Agreement is a five-page document which sets forth the parties' duties in considerable detail. It provides that ADSRCM will process and submit TDH's claims to the commercial and government payers, and lists twelve transaction types which ADSRCM agrees to process. (Compl. Exh. B ¶ 1.) It details TDH's obligations in a similar manner. (*Id.*¶ 2.) It further describes numerous cost-based fees which ADSRCM intended to submit on its monthly invoice, and details the method by which ADSRCM would bill TDH for its work. (*Id.* ¶ 4.)

At the bottom of the Service Agreement is an arbitration clause:

> **Arbitration:** Customer and ADSRCM understand and agree that their sole and exclusive remedy for any claims that each may have against the other arising under or in connection with this agreement, other than Paragraph 15 / Liquidated damages, shall be determined by arbitration with ADR Options, Inc., Two Commerce Square, Suite 1100, Market Street, Philadelphia, Pennsylvania 19103-7044, having exclusive jurisdiction over such claims. It is further agreed by the parties that any hearing before ADR Options shall take place in the State of New Jersey. It is further agreed by customer that each Party should bear their own costs of Arbitration.

(*Id.* ¶ 24.)

## B. Negotiations, and a Breakdown in the Reimbursement Process

The parties negotiated the agreements for approximately a one-and-a-half months, beginning in June 2018 and ending on July 13, 2018. (Compl. ¶ 8.) TDH was represented in the negotiations by one of its principals, McKay Whiting. (*Id.*) ADSRCM told Ms. Whiting that it would be able to deliver healthcare software solutions which would maximize TDH's reimbursements and optimize its productivity. (*Id.*)  ADSRCM conducted a presentation for TDH on July 2, 2018 which outlined its services and TDH's expected benefit from the contract. (*Id.* ¶ 9.) Ms. Whiting was convinced and signed the agreement. (*Id.*)

Soon after entering the contract, TDH began to experience a significant drop off in reimbursements for claims submitted to the payers, and, at one point, the reimbursements stopped altogether. (*Id.*) TDH hired a third-party billing company to review ADSRCM's submissions, and the third party concluded that ADSRCM had committed a variety of mistakes which caused a massive reimbursement bottleneck. (*Id.* ¶ 11.) TDH claims it was nearly bankrupted by the errors. (*Id.* ¶ 12.)

### C. Alleged Fraud

TDH admits that it freely entered the Purchase Agreement. It claims, however, that it entered into the *Service* Agreement (which contains the agreement to arbitrate) as a result of fraud on the part of ADSRCM. According to TDH, ADSRCM fraudulently induced TDH to enter into the agreement by making the text of the link to the Service Agreement smaller than much of the other text in the agreement, thus preventing Ms. Whiting from seeing the link and realizing that she was committing to the provisions in the linked Service Agreement. (*Id.* ¶ 14.) TDH further alleges that ADSRCM never discussed the terms set forth in the Service Agreement during negotiations and that ADH never would have assented to the statute of limitations or arbitration provisions in the Service Agreement if ADSRCM had not concealed them. (*Id.* ¶¶ 14–16.) Finally, TDH alleges that because the arbitration provision in the Service Agreement did not clearly state that TDH was waiving its right to a jury trial, it is invalid. (*Id.* ¶ 17.)

### D. Procedural History

TDH filed its complaint on December 19, 2019, asserting fraudulent misrepresentation, breach of contract, breach of the implied covenant of good faith and faith dealing, negligent misrepresentation, and violations of the New Jersey Consumer Fraud Act. (Compl. ¶¶ 18–42.) It alleges that ADSRCM committed misrepresentations by failing to mention the arbitration clause during negotiations, "hiding" the link to the Service Agreement in the body of the Agreement, and overstating its ability to offer superior healthcare

4

processing solutions. (*Id.* ¶ 19.) ADSRCM filed a motion to compel arbitration and stay the complaint pending arbitration, (DE 6-1), which TDH opposed, (DE 13), and ADSRCM filed a reply, (DE 15.)

## II.   STANDARDS OF REVIEW

### A. Motions to Compel Arbitration

The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 522 (3d Cir. 2009). The FAA provides that "as a matter of federal law 'a written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract.'" *Id.* There is, accordingly, "a strong federal policy in favor of resolving disputes through arbitration." *Id.*

This Circuit's case law has meandered somewhat in defining the proper standard of review of a motion to compel arbitration. The upshot, however, is fairly clear. Where the issue can be decided without evidence, it will be, based on an application of the familiar Federal Rule of Civil Procedure 12(b)(6) standard to the face of the pleadings. Failing that, however, the Court will permit discovery and decide the issue on a summary judgment standard, pursuant to Rule 56. If there is a genuine issue of fact, summary judgment will be denied and the issues will be tried.

Because arbitration is a "matter of contract" between two parties, "a judicial mandate to arbitrate must be predicated upon the parties' consent." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). Pursuant to the FAA, a court may enforce a contract to arbitrate, but only if the court is satisfied that the "making of the agreement" to arbitrate is not "in issue." *Id.*

In *Guidotti v. Legal Helpers Debt Resolution*, the Third Circuit stated the approach a court must take on a motion to compel arbitration. The judiciary must balance the competing goals of the FAA: the speedy and efficient resolution of disputes, and the enforcement of private agreements. *Id.* at 773. Reconciling sometimes murky precedent in light of those competing interests, the *Guidotti* court reasoned that where "the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or ... documents relied upon in the  complaint), . . . the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery." *Id.* at 773-74. Such an approach "appropriately fosters the FAA's interest in speedy dispute resolution. In those circumstances, '[t]he question to be answered . . . becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis' for rejecting the affirmative defense." *Id.* at 774 (quoting *Leone v. Aetna Cas. & Sur. Co.*, 599 F.2d 566, 567 (3d Cir. 1979).

"In many cases, however, a more deliberate pace is required, in light of both the FAA's insistence that private agreements be honored and the judicial responsibility to interpret the parties' agreement, if any, to arbitrate." *Id.*

> [The Rule 12(b)(6) standard will not be appropriate] when either the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate or the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did. Under the first scenario, arbitrability not being apparent on the face of the complaint, the motion to compel arbitration must be denied pending further development of the factual record. The second scenario will come into play when the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue. At that point, the Rule 12(b)(6) standard is no longer appropriate, and the issue should be judged under the Rule 56 standard.

> Under either of those scenarios, a restricted inquiry into factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate and the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement. In such circumstances, Rule 56 furnishes the correct standard for ensuring that arbitration is awarded only if there is an express, unequivocal agreement to that effect.

*Id.* (citations and quotations omitted).

Thus, where the complaint and supporting documents are unclear as to an agreement to arbitrate, or where a plaintiff responds to a motion to compel with additional facts sufficient to place arbitrability "in issue," the parties should be entitled to discovery. After discovery on the issue of arbitrability, a court may then "entertain a renewed motion to compel arbitration" and should review such a motion under the summary judgment standard.

### B. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters*, 760 F.3d at 302.

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712

7

F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

## III.    APPLICATION

I find that the arbitration clause in the Service Agreement is enforceable and that it requires that this action be brought before an arbitrator. Although there is a "strong federal policy favoring arbitration," *Century Indem.*, 584 F.3d at 523, that "does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." *Id.* Rather, "[b]efore compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Id.* (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)).

To compel arbitration, I must "find that there is a valid agreement to arbitrate because the basis for contractual arbitration is consent, not coercion." *Id.* (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995)). "Furthermore, the parties might agree to the resolution of some but less than all of their disputes arising out of a particular contract or relationship through arbitration, and thus even if a court finds that the parties have agreed to arbitrate some disputes it must find, to order arbitration, that the parties have agreed to arbitrate the dispute in issue." *Id.*

It is plain from the face of TDH's complaint that the parties entered into an agreement to arbitrate, and that the scope of that agreement is quite broad, covering all claims "arising under or in connection with this agreement," (Compl. Exh. B ¶ 24.) Under *Guidotti*, then, TDH must come forward with allegations that make out a plausible claim that the arbitration agreement should not apply. 716 F.3d at 774 (motion to arbitrate is only defeated when

plaintiff can adequately plead a claim that, if true, would provide a basis for rejecting the affirmative defense).

TDH argues that the agreement to arbitrate is invalid for two reason: (1) it was fraudulently induced to enter into the Service Agreement, so the arbitration agreement therein is invalid; and (2) the arbitration provision did not make explicit that it constituted a waiver of a jury right and thus is invalid under the New Jersey Supreme Court's decision in *Atalese*.

These arguments are not persuasive. As to TDH's first argument, its fraud-in-the-inducement claim targets the Service Agreement as a whole, rather than the arbitration provision specifically. Since the arbitration clause grants the arbitrator sole jurisdiction over such questions, I do not have authority to evaluate TDH's claims. Even if viewed as a claim of fraud in the execution, decidable by the Court, it is inadequately pled because TDH's factual allegations in support of it are insufficient to render it plausible.

TDH's second argument, based on the New Jersey Supreme Court's decision in *Atalese*, does go solely to the arbitration clause, but I conclude *Atalese* does not apply to major commercial contracts between sophisticated business entities. I therefore reject that argument as well.

## A. Allegations that ADSRCM Engaged in Fraud

"Like other contracts, [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Accordingly, "where a party challenges the validity of an otherwise controlling arbitration clause, courts hear that challenge." S. *Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assur. Co.*, 840 F.3d 138, 143 (3d Cir. 2016) (citing *Rent-A-Center*, 561 U.S. at 71). Though TDH raises generally applicable contract defenses against the arbitration clause in this case, those defenses lack factual support.

### 1. Fraudulent Inducement

TDH's fraudulent inducement claim applies to the entire contract, not solely the arbitration provision; under established case law, that claim of fraudulent inducement must itself be arbitrated. The issue concerns the Third Circuit's division of labor between the court and the arbitrator.

A court may invalidate a contractual arbitration provision based on fraudulent inducement only where the "challenge . . . focus[es] exclusively on the arbitration provision, rather than on the contract as a whole." S. *Jersey Sanitation Co.,* 840 F.3d at 143 "[O]nly an arbitration-provision specific challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Id.* (quoting *Rent-A-Center*, 561 U.S. at 70).

If the challenge instead "encompasses the contract as a whole, the validity of that contract, like all other disputes arising under the contract, *is a matter for the arbitrator to decide.*" *Id.* (emphasis added). That is because, as a matter of federal substantive law, arbitration clauses are "severable" from the rest of the contract; thus, a challenge to the whole agreement (also known as the "container contract," because it contains the arbitration agreement) goes generally to the provisions of the container contract, not the arbitration clause specifically. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). If, as here, such allegations of fraudulent inducement pertaining to the whole agreement fall within the scope of the arbitration clause, then the arbitrator has sole jurisdiction to decide them. *See MXM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020) ("a claim of fraud in the inducement of the container contract is for the arbitrator")

It is plain from TDH's complaint and opposition that its fraud-in-the-inducement claim goes to the container contract as a whole, not specifically to the agreement to arbitrate. In construing such allegations, courts properly consider the way the claim is phrased in the complaint, *S. Jersey Sanitation*, 840 F.3d at 144–45, as well as the outcome if the plaintiff were to prevail, *Huertas v. Foulke Mgmt. Corp.*, 2017 WL 6447868 at *5 (D.N.J. Dec. 18, 2017)

10

("If Huertas were to prevail on this argument, the entire agreement would be invalidated and unenforceable," so fraud claim was for the arbitrator); *see also Lomonico v. Foulke Mgmt. Corp.*, 2020 WL 831134 at \*6–7 (D.N.J. Feb. 20, 2020).

TDH asserts in its complaint that the arbitration clause is invalid because it is a part of the Service Agreement, and that the link to the Service Agreement was fraudulently "hidden" in the middle of the Purchase Agreement. (Compl. ¶¶ 13–14.) Now it is true that the *reason* for TDH's current objection is that it wants to avoid arbitration. The *grounds* for the challenge, however, apply to the whole Service Agreement, and, if accepted would invalidate the whole Service Agreement. (Compl. Exhs. A–B.) Indeed, TDH's filings appear to acknowledge as much. It alleges in its complaint that "Discovery House did not assent *to the terms in the Service Agreement* and there was no meeting of the minds regarding these terms," (Compl. ¶ 16 (emphasis added)). In its Opposition, it argues that "The Discovery House asserts that it did not see the link to the Services Agreement and did not agree to, and cannot be bound by, *the provisions of the Services Agreement* due to Defendant's fraud." (Opp. at 10 (emphasis added).) These allegations make clear that Discovery House's fraud-in-the-inducement claim is directed towards the whole agreement, not merely the arbitration clause. Fraudulent inducement is therefore is a question for the arbitrator. *See MXM Constr. Co.*, 974 F.3d at 397 ("a claim of fraud in the inducement of the container contract is for the arbitrator") (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)).[4]

---

[4] I reject TDH's assertion that the language in the arbitration clause in this case does not encompass a fraud in the inducement claim, as courts routinely conclude that clauses with similar language apply to all of the causes of action TDH brings in this case. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (finding nearly identical language of "claim arising out of or relating to this Agreement" encompassed claim of fraudulent inducement); *S. Jersey Sanitation*, 840 F.3d at 144–45 ("the FAA does not permit [a] federal court to consider claims of fraud in the inducement of [a] a contract generally") (quoting *Prima Paint*, 388 U.S. at 404); *see also Brown v. Coleman Co.*, 220 F.3d 1180, 1184 (10th Cir. 2000) (clause covering "all disputes or controversies arising under or in connection with this Agreement" was "the very definition of a broad arbitration clause."); *Adams v. ModernAd Media, LLC*, 2013

This case, if TDH's allegations are to be credited, parallels the facts in *Huertas*, where car salesmen presented the plaintiff with a series of documents for signature, then immediately whisked them away before the plaintiff could review them and realize he was agreeing to arbitration. 2017 WL 6447868 at *5. Huertas asserted that he was coerced into signing the contract under duress because the salesmen had intentionally dragged out the sales process in order to exhaust him, did not discuss any documents with him, instructed him to sign on numerous signature lines, and maintained physical control of the contracts so that Huertas could not review them. *Id.* at 2. The court concluded that the challenge applied to the entire contract, not solely to the arbitration agreement, because "[i]f Huertas were to prevail on [his argument that the salesmen had defrauded him by concealing the documents' provisions], the entire agreement would be invalidated and unenforceable." *Id.* It thus submitted the issue of the agreement's validity to arbitration. TDH's claim mirrors that of Huertas in every important way: it is directed at the entire Service Agreement, and would have the effect, if granted, of invalidating the entire contract.

For completeness, however, I consider in the alternative the substance of TDH's fraudulent inducement claim. Even if it were viewed as going specifically to the arbitration clause, and therefore reviewable by the court, I would reject it on a motion to dismiss standard. TDH has failed to adequately plead fraud in the inducement. *See generally Guidotti*, 716 F.3d at 774.

In order to plead a claim of fraud in the inducement, TDH must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Walid v. Yolanda for Irene Couture*, 425 N.J. Super. 171, 180 (App. Div. 2012) (quoting *Banco Popular North America v. Gandi*, 184 N.J.

---

WL 674024 at *4 (D. Colo. Feb. 25, 2013) (similar clause covered breach of contract and fraudulent misrepresentations).

161, 172–73 (N.J. 2005)); *see also Wilhelm Reuss GmbH & Co. KG, Lebensmittelwerk v. East Coast Warehouse & Distrib. Corp.,* 2018 U.S. Dist. LEXIS 106442 at \*13–14 (D.N.J. June 26, 2018) (quoting *RNC Sys., Inc. v. Modern Tech Grp., Inc.,* 861 F. Supp. 2d 436, 451 (D.N.J. 2012)). Reliance must be "justifiable" and "actual," and a "purchaser experienced in a business may not be justified in relying upon a misrepresentation . . . where he knows it is false or its falsity should be obvious to him." *Walid,* 425 N.J. Super. at 181.

TDH claims that ADSRCM misled it into believing the Purchase Agreement was the entire contract by using a smaller font for the link to the Service Agreement. That argument is simply not supported by the facts. The font of the link to the Service Agreement is barely smaller than the bulk of the text in the Purchase Agreement, and is in fact the same size as many other important provisions, such as those setting forth the minimum service fee, the billing services rate reduction schedule, and the banking process by which fees were to be paid. (*See* Compl. Exh. A.) The reference to the Service Agreement was not "hidden" in the middle of the page, as TDH asserts. (Opp. at 11.) Rather, it appears immediately beneath the line in the Purchase Agreement which sets the dollar amount that TDH owed upon signing the contract, and just above other critical provisions which are in similarly sized text. (Compl. Exh. B.) ADSRCM therefore engaged in no misrepresentation; it merely incorporated another agreement by reference, a common business practice which has been upheld as permissible by numerous courts in this Circuit. *See, e.g., Metro Auto Sales, Inc. v. Reynolds & Reynolds Co.,* 2015 U.S. Dist. LEXIS 94464 at \*21 (E.D. Pa. July 21, 2015) (agreement incorporated by reference where party inserted link to agreement in contract). To do so, it employed a link placed prominently in the middle of a two-page contract. If TDH, for whatever reason, failed to notice or read the link or the linked Service Agreement, its error does not invalidate the contract.

No reasonable business person could have thought that the Purchase Agreement constituted the whole of the parties' agreement. As ADSRCM notes,

this was, at minimum, an agreement involving the processing of approximately $14 million in collections, a figure which could have grown to as much as $25.5 million. (MTA at 7; Compl. Exh. A.) As TDH admits, even a brief breakdown in processing these collections was enough to nearly bankrupt the company. (Compl. ¶ 12.) A brief review of the Purchase Agreement shows that it contains essentially no explanation of the services ADSRCM would provide or what TDH was expected to do in return. (Compl. Exh. A.) Indeed, TDH's own assertions that ADSRCM breached the contract rely on obligations set forth in the Service Agreement—an implicit recognition that the Purchase Agreement is an incomplete statement of the parties' mutual obligations. (*See, e.g.*, Compl. ¶ 7 (setting out duty to "prepare, process, and submit on behalf of The Discovery House all claims for third party payments to commercial and government payers for services provided by The Discovery House to its patients."); Compl. Exh. B ¶ 1 (setting out that duty nearly verbatim); *see also* Compl. Exh. A, *passim* (no mention of that duty); *Compl.* ¶¶ 6, 13, 15, 26 (same).)

It is simply not plausible that a sophisticated business entity could have believed that such an important agreement, involving so much money and regarding such a crucial aspect of TDH's business, would be wholly contained within a two-page pricing document. Nor is it plausible that a link in a slightly smaller font would actually, let alone justifiably, be ignored by such a business entity entering into such a contract. Even assuming that TDH harbored such unreasonable beliefs, such beliefs were plainly not justifiable, and fraudulent inducement requires *justifiable* reliance. *Walid*, 425 N.J. Super. at 181.

Finally, TDH's assertion that ADSRCM did not mention the arbitration agreement during negotiations is insufficient to state a claim for fraud. *Twombly*, 550 U.S. at 570. Fraud cannot be grounded on a negotiating partner's failure to state orally every provision in a written contract. *See, e.g.*, *E.H. v. J.L.*, 2018 N.J. Super. Unpub. LEXIS 884 at *6–7 (App. Div. Apr. 17, 2018) (plaintiff's failure to mention wedding date during negotiations did not, without more, constitute fraud). Nor has TDH offered anything beyond

generalized, conclusory allegations in support of a factual allegation that ADSRCM intentionally failed to mention the arbitration provision during negotiations in order to mislead TDH. (*See, e.g.,* Compl. ¶ 20 (ADSRCM's communications . . . were made intentionally and with the knowledge that the representations were false")).)

Assuming in the alternative that it is for me to decide, I find that TDH has failed to state a claim for fraud in the inducement. For this alternative reason, too, the contract requires that the claims be arbitrated.

### 2. Fraud in the Execution

In an abundance of caution, I consider a second alternative argument. Although TDH elected to bring its claims under the banner of fraud in the inducement, it perhaps could have recharacterized its claim as one of fraud in the execution. The difference is important, because claims of fraud in the execution are typically decided by the court, rather than by an arbitrator. As a result, for completeness, I will consider TDH's claim as one of fraud in the execution. I nevertheless conclude that this case must be referred to the arbitrator.

Fraud in the inducement and fraud in the execution are similar, but distinct, causes of action:

> Fraud in the inducement occurs when someone signs the document they intended to sign, but their assent was induced by a material misrepresentation about facts external to that document. For example, if a party misrepresents that the price of cheese will increase to induce someone into signing a contract to buy milk in bulk, that is fraud in the inducement. But if a party assures its counterparty that it is signing a contract for cheese when it is in fact a contract for milk, that is fraud in the execution. Fraud in the inducement induces a party to assent to something he otherwise would not have; fraud in the execution induces a party to believe the nature of his act is something entirely different than it actually is.

*MXM*, 974 F.3d at 405 (internal alterations and citations omitted). "[T]he difference between those claims matters because, unlike fraud in the execution, which renders the entire agreement 'void *ab initio*' as if it never

existed, fraud in the inducement only renders the contract 'voidable,' giving the defrauded party the option of rescinding the contract or claiming damages for deceit." *Id.* at 405–06. As a result, an allegation of fraud in the execution, even when aimed at the container contract rather than specifically at the arbitration agreement, "trigger[s] the District Court's power to adjudicate that claim." *Id.*

I find, however, that even if a fraud-in-the-execution claim was intended, it is inadequately alleged. "Fraud in the execution (or fraud in the factum) occurs when a party is compelled to sign the instrument 'by reason of a misrepresentation intended to deceive [it] as to its purport or content'" or where "'a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms' by reason of 'excusable ignorance.'" *Id.* at 403–04 (quoting *Peter W. Kero, Inc. v. Terminal Const. Corp.*, 78 A.2d 814, 817–18 (N.J. 1951)). Typically courts require "a relation of natural trust and confidence, though not strictly a fiduciary relation," a misrepresentation accompanied by "an affirmative intent to defraud," or "some sort of misconduct or imposition that cuts off the signer's opportunity to read, such as 'significant time pressure' and reliance on an erroneous 'assurance' that the parties' oral understanding had been or would be accurately memorialized in an instrument." *Id.* at 404 (internal citations omitted). "In short, 'failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." *Id.*

Here, TDH fails to allege facts to make plausible its claim that ADSRCM affirmatively and intentionally committed fraud in the execution. TDH never identifies any misrepresentations by ADSRCM that the Purchase Agreement constituted the entirety of the agreement. As noted above, TDH's allegation that it was misled by ADSRCM's use of small font are not supported by the facts and cannot ground its claim for fraud in the execution. TDH furthermore alleges no other representation by ADSRCM which misled it into believing that the Purchase Agreement was the whole of the agreement. TDH was not denied the opportunity to ascertain the contents of the linked Service Agreement.

16

The allegation that ADSRCM never specifically discussed the arbitration clause during negotiations is insufficient to establish fraud in the execution. *See E.H. v. J.L.,* 2018 N.J. Super. Unpub. LEXIS 884 at \*6–7. TDH fails to allege any trust relationship, representation from ADSRCM that only provisions discussed during negotiations would be a part of the contract, or factual support for its conclusory assertion that ADSRCM intended that its statements during negotiations would mislead TDH. Nor is there any indication that TDH was under any form of pressure to sign the agreement quickly or without reading it. On the contrary, this was a genuine negotiation between commercial parties. Ultimately, TDH's failure to read the contract is not excused by ADSRCM's conduct.

On these alternative grounds, then, I reject TDM's attempt to avoid arbitration.

## B. *Atalese* and Commercial Contracts

TDH brings a second challenge, which does single out the arbitration clause, characterizing it as unenforceable as a matter of law. As TDH sees it, the New Jersey Supreme Court's decision in *Atalese v. U.S. Legal Services Grp., L.P.,* 219 N.J. 430 (N.J. 2014), requires that this arbitration clause, in order to be enforceable, needed to explain clearly that arbitration constitutes a waiver of the right to a jury trial. (Opp. at 11–12.) The arbitration clause at issue here does not make clear that it constitutes a waiver of the right to sue in a judicial forum—indeed, it offers no explanation of what arbitration is or what rights are lost by agreeing to arbitration. I nevertheless conclude that it is enforceable, because I do not believe *Atalese* is applicable to this contract, which was negotiated between knowledgeable commercial parties.

*Atalese*, while not explicitly restricting its holding to consumer contracts, is phrased in terms of an average person's sophistication. The New Jersey Supreme Court rested its decision on the principles that "effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights," and "an average member of the public may not know

17

— without some explanatory comment — that arbitration is a substitute for the right to have one's claim adjudicated in a court of law." *Id.* at 442. Accordingly, it held that an arbitration clause must make clear in "plain language" "written in a simple, clear, understandable and easily readable way" that "arbitration is a waiver of the right to bring suit in a judicial forum." *Id.* at 444.

The U.S. Court of Appeals for the Third Circuit has recently concluded that the weight of authority suggests New Jersey would not extend *Atalese* to commercial contracts which "resulted 'from a lengthy negotiation process' and where no party was an 'average member[] of the public.'" *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 525 (3d Cir. 2019) (citing *Victory Entm't, Inc. v. Schibell*, 2018 WL 3059696 at *8 (App. Div. June 21, 2018)). Its survey of New Jersey Supreme Court and Appellate Division precedent, led it to the conclusion that New Jersey "has applied [*Atalese*] thus far only in the context of employment and consumer contracts." *Id.* My own review of New Jersey court decisions leads me to the same conclusion.

In *Kernahan v. Home Warranty Adm'r of Florida, Inc.*, the New Jersey Supreme Court reviewed its decision in *Atalese*. 236 N.J. 301 (N.J. 2019). *Kernahan* confirmed that *Atalese* was

> guided essentially by twin concerns. First, the Court was mindful that a consumer is not necessarily versed in the meaning of law-imbued terminology about procedures tucked into form contracts," and "second, the Court was mindful that plain language explanations of consequences had been required in numerous other settings where a person would not be presumed to understand that what was being agreed to constituted a waiver of a constitutional or statutory right.

*Id.* at 319–20 (citing *Atalese*, 219 N.J. at 442–44). The Court further explained that *Atalese* "repeatedly notes that it is addressing a form consumer contract, not a contract individually negotiated in any way; accordingly, basic consumer contract requirements about plain language implicitly provided the backdrop to the contract under review." *Id.* (citing *Atalese*, 219 N.J. at 444). In short, the

18

court concluded that "[t]he consumer context of the contract mattered." *Id.* at 320.

To be sure, *Kernahan* stopped short of an explicit holding that *Atalese* does not apply outside the consumer context. A recent decision of the New Jersey's intermediate appellate court, however, strongly suggests as much. *See generally Specialty Surfaces Int'l v. Cont'l Cas. Co.*, 609 F.3d 223, 237 (3d Cir. 2010) (in determining state law, federal courts "follow[] relevant decisions of the [highest court] and give[] 'due regard, but not conclusive effect' to decisions of the state's lower courts."). In *Dailey v. Borough of Highlands*, for instance, the Appellate Division concluded that *Atalese* was inapplicable to a contract between a business and a municipality, because "*Atalese* was primarily driven by the fact that it was examining a consumer contract" and, generally speaking, "the sophistication of the parties may bear on whether they knowingly and voluntarily agreed to a contract's terms." 2020 N.J. Super. Unpub. LEXIS 2054 at *8, 11 (App. Div. Oct. 28, 2020).

There is no doubt that the agreement in this case was negotiated by commercial parties, and that, as a multimillion dollar services contract, it was of a nature that would have commanded their attention. Given those undisputed facts, the New Jersey precedents, and the Third Circuit's decision in *Remicade*, I am convinced that *Atalese* does not apply here. Accordingly, I reject this argument as a basis for invalidating the arbitration clause.

Because the arbitration clause is valid and controls TDH's claims, I grant ADSRCM's motion to compel arbitration and stay this matter pending arbitration.

## IV.   CONCLUSION

For the reasons set forth above, the motion (DE 6) of defendant ADSRCM to compel arbitration and stay this matter pending arbitration is **GRANTED**.

A separate order will issue.

Dated: November 25, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**